## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

METROPOLITAN ST. LOUIS EQUAL
HOUSING AND OPPORTUNITY
COUNCIL,

           Plaintiff,

      v.

CITY OF MAPLEWOOD, MISSOURI,

           Defendant.

Civ. Action No. 17-cv-886

**COMPLAINT**

**JURY TRIAL DEMANDED**

### INTRODUCTION

1.      This is a challenge to the City of Maplewood's "chronic nuisance ordinance," pursuant to which the city revokes the occupancy permits of residents whom it deems to be "chronic nuisances." Maplewood designates certain residents to be nuisances simply because they have been the subject of multiple police calls, regardless of whether they did anything wrong or are, instead, the victims of domestic violence or otherwise in legitimate need of municipal services. The effect of the city's revocation of occupancy permits is to exile those residents from the City, since without an occupancy permit it is a crime to live in Maplewood.

2.      Maplewood has employed this draconian remedy in discriminatory fashion. Maplewood was almost entirely white as recently as 1970, and even now African-American residents account for only 17 percent of Maplewood's population. Nonetheless, Plaintiff Metropolitan St. Louis Equal Housing and Opportunity Council's ("EHOC") analysis of Maplewood's enforcement of its nuisance ordinance reveals that a majority of enforcement actions have been taken against African-American households. Maplewood intentionally targets its African-American residents for enforcement actions—and then banishes them from the

City—based on conduct that would not result in such enforcement against white residents. Moreover, a large percentage of Maplewood's enforcement actions have been taken against women who are survivors of domestic violence and/or people with disabilities; these actions serve no legitimate purpose and effectively punish these vulnerable populations for requiring police protection. To end this discrimination based on race, sex, and disability, EHOC, which is devoted to furthering fair housing and combating discriminatory practices such as the one described in this complaint, brings this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*, and the Missouri Human Rights Act, Mo. Rev. Stat. §§ 213.010 *et seq.*, for injunctive, monetary and declarative relief.

3.      EHOC acquired and extensively analyzed records pertaining to Maplewood's enforcement of its nuisance ordinance over a 5-year period. These records make clear that Maplewood does not enforce its law even-handedly against any person eligible for such enforcement under the law's terms. Rather, Maplewood enforces its nuisance ordinance selectively, and in doing so it disproportionately enforces the ordinance against African-American residents while ignoring similar conduct by other residents. This discriminatory enforcement has the purpose and effect of perpetuating Maplewood's status as a "white" community in the starkly segregated St. Louis metropolitan area.

4.      An alarmingly high number of enforcement actions have been taken against women who are the victims of domestic violence and/or against people with disabilities in Maplewood. Many of these people either called the police themselves for assistance or had someone else call on their behalf. Rather than protect its most vulnerable residents, Maplewood chooses to blame these victims for needing assistance and either immediately exiles them from

2

the city or puts them on probation such that they will be exiled should they again need police assistance.

5.     Maplewood is just one of many jurisdictions that have enacted some form of chronic nuisance ordinance in recent years. In response, the U.S. Department of Housing and Urban Development has issued guidance warning that discriminatory enforcement of nuisance laws can violate the Fair Housing Act. This guidance makes clear that municipalities such as Maplewood must ensure that chronic nuisance laws are enforced even-handedly. It also makes clear that municipalities such as Maplewood will have difficulty demonstrating the necessity of punishing residents simply because of a certain number of police calls.

6.     Maplewood's chronic nuisance ordinance has the purpose and effect of making housing unavailable based on race, sex, and disability, and it fails to further any legitimate purpose. In particular, rather than making communities safer, it makes them less safe by discouraging crime victims and other residents from contacting the police or availing themselves of other emergency services such as ambulances.

7.     Maplewood's discriminatory conduct has harmed EHOC by frustrating its mission to further fair housing in the region that includes Maplewood and forcing EHOC to divert resources to counteract Maplewood's discrimination. EHOC brings this action to address Maplewood's discriminatory and unlawful enforcement of its chronic nuisance ordinance and to redress the harm it has suffered and will continue to suffer as a direct result of Maplewood's discriminatory practices absent relief.

## PARTIES

8.     Plaintiff Metropolitan St. Louis Equal Housing and Opportunity Council is a private, non-profit corporation founded in 1992. It is dedicated to ensuring equal access to

3

housing and places of public accommodation for all people through education, counseling, investigation, and enforcement. EHOC serves the greater St. Louis area, where it is the only private, non-profit corporation working to end illegal housing discrimination.

9.     Defendant City of Maplewood, Missouri is a municipal corporation located in St. Louis County, Missouri.  The City is organized under and operates by virtue of the rules of the State of Missouri as a home rule unit of local government.  The City is governed by a Mayor and a six-member City Council. It acts through its agents and employees and is responsible for the actions described below, which were taken by agents and employees acting within the scope of their authority.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter under 42 U.S.C. § 3613, which authorizes claims brought under the Fair Housing Act. This Court also has jurisdiction under 28 U.S.C. § 1331 and 1343(a)(3), because the Fair Housing Act claim alleged herein arises under the laws of the United States. This Court has supplemental jurisdiction over the Missouri Human Rights Act claim pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b), because the claims arose in the District, Defendant is incorporated in and/or resides in this District, Plaintiff does business in this District, and a substantial part of the events giving rise to this action occurred in the District.

## FACTS

### Maplewood's History of Racial Division

12.    Maplewood adopted its nuisance ordinance against a background of municipal decline and changing demographics. Once prosperous and virtually all white, Maplewood in recent years has seen increasing racial diversity and a falling population.

13.    Maplewood was incorporated in 1908 as one of St. Louis's early, "inner-ring" suburbs. Located directly to the west of St. Louis, it was designed to be a "bedroom community" for people who worked in St. Louis but wanted to live outside the city. By the 1950 Census, Maplewood's population had increased to more than 13,000. Virtually all of those residents—all but about 1% of them—were white.

14.    The population of Maplewood—like that of other inner-ring St. Louis suburbs—dwindled. Beginning in the 1960s, Maplewood's population has been in a steady decline. By the 1990 Census, the City's population had fallen to under 10,000. By the 2010 Census, the City's population barely exceeded 8,000.

15.    Although Maplewood remains a majority-white municipality, its population has become increasingly racially diverse. As of 1970, Maplewood still had just 252 African-American residents, less than 2% of its population. By 1990, Maplewood had 1,425 African-American residents, comprising more than 14% of Maplewood's population. In the next two decades, Maplewood's African-American population remained steady, but became a larger share of the city's diminishing population. In 2010, Maplewood had an African-American population of 1,384, more than 17 percent of its population.

16.    In recent years, Maplewood has taken steps to arrest and roll back these demographic changes. It has explicitly sought to lure more upscale, white residents to replace

5

those who have been lost, highlighting its historic downtown and rising property values. The City's website states: "Over the past decade, Maplewood's central location and housing values have brought many young professionals and their families to our community."[1]

### Maplewood's Adoption and Enforcement of Its Nuisance Ordinance

17.     Against that background of years of declining population and demographic change, and amidst hopes for revitalization, Maplewood in 2006 instituted one of the country's most onerous nuisance ordinances.

18.     Maplewood requires each renter to obtain an "occupancy permit" for every apartment rented. Applying for an occupancy permit costs $15. Applicants must allow city officials to inspect a photo identification. An applicant must specify every proposed resident of the dwelling and certify his or her understanding that no one else is permitted to reside there. Maplewood Code of Ordinances § 12-25.

19.     In 2006, Maplewood enacted an ordinance that permits occupancy permits to be revoked for a variety of actions that lead a person to be deemed a "nuisance." The effect of such revocation is to exile the person in question from the City, since without an occupancy permit that person is neither allowed to rent a dwelling nor reside at anyone else's dwelling.

20.     Maplewood Code § 34-240 defines eligible "nuisances" so broadly as to potentially include virtually any act that city officials do not like.

21.     For example, a nuisance can be:

---

[1] City of Maplewood, *Demographics*, available at http://mo-maplewood.civicplus.com/104/Demographics.

6

- "Any act done or committed or allowed to be done and committed . . . which is injurious or dangerous to public health." Maplewood Code § 34-240(1).

- "Any pursuit followed or act done . . . to the hurt, injury, annoyance, inconvenience or damage of the public." Maplewood Code § 34-240(2).

22. More specifically, Maplewood defines a nuisance to include, among many other things, more than two instances within a 180-day period of "peace disturbance or domestic violence resulting in calls to the police." Maplewood Code § 34-240(17)(f). Thus, on its face, Maplewood's ordinance specifically provides that a woman who suffers an incident of domestic violence that results in a call to the police is a proper target of enforcement.

23. Once a nuisance has been identified, Maplewood's ordinance calls for a hearing before the city manager or a designee. The hearing officer then must issue an order that will "effect the abatement of the nuisance by any means necessary." Maplewood Code § 34-242(2)(e). The ordinance, however, specifies only one means of abating such a "nuisance": revoking a resident's occupancy permit for a period of up to six months. *Id.* Such revocation amounts to an effective exile from the City for that period.

### Maplewood's Discriminatory Enforcement of Its Nuisance Ordinance

24. As described above, Maplewood's nuisance ordinance is drafted so as to give the city enormous discretion in deciding which people it will exile from the City. In practice, Maplewood has invoked this harsh remedy primarily against African Americans; people with disabilities; and women who are facing domestic violence.

25.     EHOC's investigation, which included multiple requests for public records, uncovered details about 43 enforcement hearings Maplewood held between March 2010 and August 2015.

26.     In 34 of the hearings, the race of the household could be ascertained. In 19 of those—more than 55 percent—the household was African-American. The African-American share of nuisance enforcement actions thus is three times as high as the African-American share of the city's population (17 percent).

27.     No relevant difference between African-American and white residents that is unrelated to race can explain this disparity. Neither can any legitimate enforcement policy. Rather, Maplewood enforces its ordinance so as to punish—and often drive out of the City altogether—African-American residents for reasons that would not lead to enforcement action against white residents.

28.     In particular, Maplewood has chosen to bring multiple enforcement actions against African-American women who are the *victims* of domestic violence. Such enforcement would be unlawful and unreasonable against any woman. Maplewood's decision to do so only against African-American women demonstrates the discriminatory nature of its ordinance enforcement.

29.     Sixteen of the 43 enforcement actions—more than 37 percent—arose at least in part out of incidents of domestic disturbance. In six of them—almost one-seventh of all enforcement actions studied—the "nuisance" involved a female resident being attacked by a male partner, former partner, or rebuffed suitor. Rather than protecting these survivors, Maplewood instituted enforcement actions against them.

8

30.     All six of those female residents punished for being survivors of domestic violence were African-American.

31.     In all six of those incidents, Maplewood deemed the survivor of domestic violence to be a nuisance subject to occupancy permit revocation. In two of them, it "suspended" the revocation, essentially putting the survivor on probation. These orders still constitute a significant infringement of liberty, because they effectively forbid these women from reporting incidents of domestic violence or calling for police assistance during the specified time, on pain of being exiled from town.

32.     For example, one order revoked a woman's occupancy permit after she was abused repeatedly by her husband, who no longer lived with her. The order suspended that revocation for twelve months, conditioned on no further "incidents of peace disturbance or domestic violence" occurring at her property during that period.

33.     Similarly, Maplewood held an enforcement hearing against another woman based on three incidents in which a male acquaintance, whose romantic advances she had rebuffed, became intoxicated in and around her home and threatened violence against her. That enforcement action led the pastor at the woman's church and a fellow churchgoer to submit letters supporting her and criticizing the threatened revocation of her occupancy permit. Maplewood conditionally suspended enforcement of that order for twelve months. One of the conditions it imposed was that the woman immediately obtain and vigorously enforce a restraining order against the acquaintance. Maplewood's order did not explain how the woman could vigorously enforce the restraining order without calling the police and thereby risking revocation of her occupancy permit.

9

34.     Maplewood's enforcement of its nuisance ordinance similarly discriminates against individuals with disabilities.

35.     Eleven of the enforcement actions—more than a quarter—involved residents whose "misconduct" was the manifestation of mental illness or other disabilities. Rather than making any accommodations for these disabilities, or providing any other assistance, Maplewood used these behaviors as a reason to exile the resident in question.

36.     For example, one suicidal man had his occupancy permit revoked for making too many calls for medical assistance. Another resident suffering from depression had his occupancy permit revoked for a "peace disturbance" after his girlfriend made a police call to report that he was considering committing suicide.

37.     In a particularly troubling incident, Maplewood took enforcement action against a suicidal woman suffering from depression and post-traumatic stress disorder as a result of a rape. Maplewood cited her for generating too many calls for police services. The woman did not even make the last of the police calls for which Maplewood cited her; rather, the call was made by a volunteer at a suicide hotline who was concerned for her safety.

38.     Maplewood's discriminatory enforcement of its nuisance ordinance has caused residents to be afraid to call for ambulance or police assistance, for fear of having their occupancy permits revoked. Residents—particularly those who already have been subject to nuisance ordinance enforcement—understand that each such call generates a record that can eventually be used against them, no matter how justified the call may be.

39.     For example, shortly after Maplewood entered an order revoking the occupancy permit of one family of five because both parents had experienced mental-illness-related incidents that required police calls, one parent had an episode that required her hospitalization.

10

Because the family was afraid to call an ambulance, they instead were forced to pay $35 for a cab ride. As one parent told the city in a voicemail: "We had to call a cab because apparently the ambulance is a crime for us."

40.     Upon information and belief, Maplewood does not enforce its ordinance even-handedly against all residents who could be eligible for such enforcement, but instead enforces the ordinance selectively against those residents whom it deems undesirable for other reasons.

41.     This process was illustrated by an e-mail sent by one city official to another regarding a woman whom a social services agency was trying to help find a home in Maplewood. The agency had told city officials it understood there could be a problem if the woman's occupancy permit previously had been revoked. The city official checked records and found that no nuisance hearing had occurred regarding that woman. However, she said in the e-mail to the other city official that before calling the agency back she would "see if we have enough to hold a nuisance hearing on her."

42.     On information and belief, other residents have engaged in conduct that would permit Maplewood to revoke their occupancy licenses, but Maplewood has not acted against them. Instead, Maplewood has chosen to selectively enforce its ordinance in a manner that has a disproportionate impact based on race, sex, and disability. It has done so knowingly and intentionally.

43.     Maplewood is aware of the chilling effects of its enforcement choices, but it nonetheless continues to enforce its ordinance in a manner that discourages crime victims from contacting the police.

## Maplewood's Enforcement of Its Ordinance Serves No Legitimate Purpose and Contradicts Federal Law and Guidance

44.     Maplewood's discriminatory enforcement of its nuisance ordinance serves no legitimate purpose. There is no legitimate reason for Maplewood to exile people from the City based on number of police calls. And even if it were ever proper for Maplewood to do so, there is no legitimate reason to target African-American residents for selective enforcement; punish women for being survivors of domestic violence; or banish individuals with disabilities rather than providing them with appropriate and reasonable accommodations.

45.     In particular, Maplewood's enforcement of its nuisance ordinance does not further the legitimate interest in tenant safety. Instead, it makes housing less safe by discouraging residents, neighbors, and landlords from contacting law enforcement.

46.     Even if Maplewood's enforcement of its nuisance ordinance did make housing safer or otherwise further some legitimate interest, such a goal could be achieved in a manner that does not result in such a disproportionate and severe harm on African-American and female residents as well as residents with disabilities.

47.     Maplewood's enforcement practices are inconsistent with various federal laws and guidance, further demonstrating that they are not the least discriminatory means of accomplishing any legitimate end.

48.     For example, in 2005, Congress recognized that it is improper to evict survivors of domestic violence because of their abusers' activities. Accordingly, Congress amended the Violence Against Women Act to provide that, for federally funded housing, intimate partner violence "shall not be good cause for terminating the assistance, tenancy, or occupancy rights of the victim of such violence." 42 U.S.C. § 1437f(c)(9)(B); *see also* 42 U.S.C. § 14043e-11(b) (covered housing programs may not deny occupancy based on the applicant or tenant being a

12

victim of domestic violence). While those provisions do not directly regulate private housing or the municipal nuisance ordinance at issue here, they express a clear federal policy that is inconsistent with the notion that Maplewood's policy of revoking the occupancy permits of survivors of domestic violence is ever appropriate, let alone could be the least discriminatory means of furthering any legitimate safety interests.

49.     Most survivors of domestic violence are women. In specifically targeting survivors of domestic violence for nuisance law enforcement, Maplewood thus discriminates on the basis of sex.

50.     Punishing those who need police or other emergency services for seeking them may also infringe on their First Amendment right to petition the government for assistance. There is no legitimate reason for violating the constitutional rights of survivors of domestic violence and individuals with disabilities who need assistance, nor can doing so be the least discriminatory means of achieving a legitimate end.

51.     The U.S. Department of Housing and Urban Development issued guidance in 2016 confirming that nuisance ordinances that function like Maplewood's are not the least discriminatory means of accomplishing a legitimate purpose.[2]

52.     HUD observed that many such ordinances, like Maplewood's, result in tenants' eviction because of police contacts regardless of whether the tenants did anything wrongful. Under such circumstances, it stated, a municipality will have a "difficult burden" to prove that it is necessary to "cut[] off access to emergency services for those in grave need of such services,

---

[2] See HUD, Office of General Counsel, *Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services* (Sept. 13, 2016).

including victims of domestic violence or other crimes, thereby potentially endangering their lives, safety and security."

53.     Accordingly, as HUD's guidance makes clear, a nuisance ordinance that has a disparate impact based on race, sex and/or disability—as Maplewood's does—is likely to violate the Fair Housing Act, because there is no legitimate reason for enforcing such an ordinance in the manner that Maplewood does.

### Injury to EHOC

54.     Maplewood's enactment and enforcement of its nuisance ordinance has injured and is continuing to injure Plaintiff Metropolitan St. Louis Equal Housing and Opportunity Council. EHOC has devoted significant resources to identifying and counteracting Maplewood's unlawful practices, and the injuries described below are fairly traceable to those practices.

55.     As described above, Maplewood's nuisance ordinance has the purpose and effect of making housing opportunities unavailable, and making the terms and conditions of housing less favorable, based on race, sex, and disability. It also has the purpose and effect of perpetuating Maplewood's status as a white enclave in the deeply segregated St. Louis area.

56.     EHOC's broad mission is to eliminate housing discrimination and racial segregation in housing in the St. Louis metropolitan area. It has only very limited resources, and thus discriminatory practices that require it to divert those resources from other worthy projects frustrate the full achievement of EHOC's mission.

57.     Maplewood's discriminatory enforcement of its nuisance ordinance has frustrated and continues to frustrate EHOC's mission of ensuring that all people have equal access to housing opportunities, in Maplewood and elsewhere in the region that EHOC serves.

14

58.     In response, EHOC has diverted scarce resources and staff to investigating and remedying Maplewood's discriminatory enforcement. Those resources and staff would have been devoted to other projects if not for the discriminatory actions described in this complaint.

59.     For example, when it becomes aware of occupancy permit revocation proceedings, EHOC has expended staff time and other resources representing some of those targeted in order to ensure that fair housing rights are protected. Maplewood's ordinance thus has directly depleted EHOC's resources.

60.     Maplewood does not inform EHOC or anyone else on a regular basis when permit revocation proceedings have been initiated. In order to preserve its ability to combat Maplewood's discriminatory enforcement, EHOC has had to expend staff time and other resources monitoring city functions to detect permit revocation proceedings.

61.     EHOC has had to expend resources acquiring public information about Maplewood's enforcement practices in order to confirm and document the extent of Maplewood's discrimination. In particular, Maplewood has charged EHOC thousands of dollars to obtain the public records that permitted the analysis necessary to assess the nature and scope of Maplewood's discriminatory enforcement practices.

62.     EHOC has devoted considerable staff time and other resources to analyzing this evidence and evaluating Maplewood's conduct in order to counteract the discrimination described in this complaint.

63.     EHOC has had to expend resources doing outreach to the community about Maplewood's discriminatory enforcement, educating community members, and otherwise counteracting the effects of Maplewood's discrimination. These activities, too, have required the diversion and expenditure of financial resources and staff time. Maplewood would not have

15

engaged in these activities and expended such resources if not for Maplewood's discriminatory conduct.

64.     For example, in reaction to Maplewood's discriminatory conduct, EHOC has given presentations at numerous area events to educate community members, advocates, organizations, and municipal employees regarding discriminatory nuisance ordinance enforcement in general and Maplewood's ordinance in particular. These events include, but are not limited to:

- Multiple sessions about nuisance ordinances and their discriminatory effects at EHOC's annual regional fair housing training conference on April 10, 2015—a conference that Maplewood officials attended;

- An October 2015 training for social workers and domestic violence advocates at Washington University regarding nuisance ordinance enforcement;

- An October 2015 training for local government officials about fair housing issues affecting the area, including nuisance ordinance enforcement;

- A June 2016 presentation to the St. Louis Ending Violence Against Women Network regarding nuisance ordinance enforcement;

65.     In reaction to Maplewood's discriminatory ordinance enforcement, EHOC also conducted a fair housing training session in July 2015 at the Maplewood Library in order to ensure that Maplewood residents understand their rights. Organizing this event required significant time spent finding a venue; distributing flyers and posters throughout Maplewood; and inviting local organizations.

16

66.     As a result of this diversion of resources to addressing Maplewood's discriminatory conduct, EHOC has had to put on hold or shelve entirely other projects that would further its mission.

67.     For example, EHOC had planned to prepare an extensive report regarding residential segregation in the greater St. Louis metropolitan area. This report, tentatively entitled "A Tale of Two Cities," would have documented in detail the disparities between predominantly white and predominantly African-American communities in the region. Because of the time spent on Maplewood's ordinance, EHOC has not been able to prepare this report.

68.     EHOC also has had to postpone an investigation into discriminatory practices by an East St. Louis landlord because of resources devoted to Maplewood's ordinance.

69.     EHOC is continuing to suffer similar injury from Maplewood's ongoing enforcement of its nuisance ordinance.

70.     Through its actions described above, Maplewood has acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing and non-discrimination laws. It is by now clear that the conduct described in this complaint violates the Fair Housing Act and other laws—and EHOC has told Maplewood as much—yet Maplewood persists in discriminatory and illegal conduct.

## CAUSES OF ACTION

### First Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604(a), (b), (f)

71.     Plaintiff realleges and incorporates the facts and allegations contained in paragraphs 1 through 70 as fully set forth herein.

72.     The federal Fair Housing Act makes it unlawful to deny housing or make housing unavailable to any person "because of race, color, religion, sex, familial status, or national

17

origin," 42 U.S.C. § 3604(a), or because of a disability, 42 U.S.C. § 3604(f)(1). The Act also makes it unlawful to discriminate in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" for the same reasons. 42 U.S.C. § 3604(b), (f)(2).

73.     Both Supreme Court precedent and regulations of the U.S. Department of Housing and Urban Development provide that a defendant can violate the Fair Housing Act either by committing intentional discrimination or through conduct that has an unnecessary disparate impact based on one or more protected classifications such as race, sex, or disability. See *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 135 S. Ct. 2507 (2015); 24 § C.F.R. 100.500, et seq.

74.     Maplewood's enforcement of its nuisance ordinance disproportionately impacts non-white residents, women, and people with disabilities, and it hinders the racial integration of a still-predominantly-white city in a region that is marked by long-standing residential segregation. These effects are not accidental, but rather stem from the intentional decisions to enforce the ordinance disproportionately in certain communities based on race, to make abuse victims responsible for the acts of their abusers, and to punish individuals with disabilities for needing city services. There is no legitimate justification for the ordinance or its discriminatory enforcement, and any legitimate purpose they serve could be accomplished in a less discriminatory manner.

75.     Maplewood's nuisance ordinance makes housing unavailable anywhere in the city for those residents whose occupancy permit has been revoked. It also discriminates against those same tenants in the privileges of renting, as well as in the provision of municipal services related to renting.

76.     In selectively enforcing its ordinance as it does, Maplewood knowingly and

intentionally makes housing unavailable, discriminates in the privileges of renting, and

discriminates in the provision of municipal services related to rental housing, because of race,

color, and disability. Additionally, it intentionally discriminates based on disability because

Maplewood revokes the occupancy permits of people with disabilities without making

reasonable accommodations for their needs.

77.     Maplewood's nuisance ordinance also violates the Fair Housing Act because it

has an unnecessary disparate impact on the availability of housing based on race, sex, and

disability, and because it perpetuates racial segregation in the greater St. Louis region.

Maplewood's nuisance ordinance serves no legitimate purpose, and even if it did, such a goal

could be achieved in a manner that does not result in such a disproportionate and severe harm on

African-American and female residents as well as residents with disabilities.

78.     Defendant, through its actions and the actions of its agents, is liable for the

violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), (b), (f).

## Second Cause of Action
### Missouri Human Rights Act, Mo. Rev. Stat. § 213.040(1), (2).

79.     Plaintiff realleges and incorporates the facts and allegations contained in

paragraphs 1 through 70 as fully set forth herein.

80.     The Missouri Human Rights Act also bars housing practices that make housing

unavailable or otherwise discriminate based on race, sex, and disability. Mo. Rev. Stat.

§ 213.040(1), (2). The Act was "patterned after the federal Fair Housing Act," *Green v. Ten

Eyck*, 572 F.2d 1233, 1238 (8th Cir. 1978), and so Maplewood's conduct violates it for the same

reasons described above with respect to the federal Fair Housing Act.

81.     EHOC has filed a complaint against Maplewood with the Missouri Commission on Human Rights. That complaint has been administratively exhausted, and the Commission has issued a right-to-sue letter regarding these allegations.

82.     Defendant, through its actions and the actions of its agents, is liable for the violation of Plaintiff's rights under the Missouri Human Rights Act, Mo. Rev. Stat. § 213.040(1), (2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Metropolitan St. Louis Equal Housing and Opportunity Council prays that this Court:

(a)     enter a declaratory judgment that the actions of Defendant complained of herein are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.040 *et seq.*;

(b)     issue a permanent injunction restraining Defendant, its agents, employees, representatives, or any other person acting directly or indirectly with Defendant from enforcing its chronic nuisance ordinance, and directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c)     award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the loss that has been caused by the conduct of Defendant alleged herein;

(d)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for its willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendant from engaging in similar conduct in the future;

(e)     award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 3613(c)(2), Mo. Rev. Stat. § 213.111; and

(f)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Metropolitan St. Louis Equal Housing and

Opportunity Council demands a trial by jury of all issues in this case.


Dated:  March 13,  2017

Respectfully submitted,

/s/ Sasha Samberg-Champion
John P. Relman*
Sasha Samberg-Champion*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
Fax:     (202) 728-0848
jrelman@relmanlaw.com
ssamberg-champion@relmanlaw.com

/s/ Thomas E. Kennedy, III
Thomas E. Kennedy, III (MO Bar No. 46617)
Sarah Jane Hunt (63899)
LAW OFFICES OF THOMAS E.
KENNEDY, III, L.C.
906 Olive St., Suite 200
St. Louis, MO 63101
Phone: (314) 872-9041
Fax:     (314) 872-9043
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com


*Attorneys for Plaintiff Metropolitan St. Louis
Equal Housing and Opportunity Center*

* *Pro hac vice* admission to be sought